## UNITED STATES v. GERKE et al.

### Appeal of GERKE et al.

### Appeal of ROBIN et al.

### Nos. 7770, 7783.

Circuit Court of Appeals, Third Circuit.
Argued Dec. 1, 1941.

Decided Jan. 16, 1942.

Writ of Certiorari Denied April 13, 1942.

See 62 S.Ct. 1033, 86 L.Ed. ——.

Charles Handler, of Newark, N. J. for Daniel W. Robin and F. W. Watson.

Samuel I. Kessler, of Newark, N. J. (Kessler & Kessler, of Newark, N. J., on the brief), for Henry Gerke and others.

Charles A. Stanziale, Asst. U. S. Atty., of Trenton, N. J. (Charles M. Phillips, U. S. Atty., of Trenton, N. J. on the brief), for the United States.

Before BIGGS, MARIS, and GOOD-RICH, Circuit Judges.

MARIS, Circuit Judge.

The defendants Henry Gerke, James T. Brown, Gerald R. Wade, Daniel W. Robin, F. W. Watson, Charles Larkey, James Holland and Joseph Turansky were found guilty of having conspired to import alcohol unlawfully into the United States in violation of section 37 of the Criminal Code, 18 U.S.C.A. § 88,[1] and all the defendants save Robin and Watson were found guilty of having unlawfully imported alcohol into the United States in violation of section 593(b) of the Tariff Act of 1930, 19 U.S.C.A. § 1593(b).[2] Each of the defendants has ap-

[1] "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both."

[2] "If any person fraudulently or knowingly imports or brings into the United States, or assists in so doing, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law, such merchandise shall be forfeited and the offender shall be fined in any sum not exceeding $5,000 nor less than $50, or be imprisoned for any time not exceeding two years, or both."

pealed upon the ground that there was insufficient evidence to sustain a judgment of conviction as to him and all the defendants take the position that the government has failed to prove a conspiracy.

■ On April 25, 1936, the United States Customs Authorities seized the tanker Charles D. Leffler, at a dock at Bayway, New Jersey, and found approximately 50,000 gallons of alcohol of foreign production on board and then being unloaded. No duty had been paid upon this alcohol. The jury found that each of the defendants had some share in a conspiracy to import this alcohol without the payment of duties upon it. The story of the Leffler is in essence the story of the alleged conspiracy. Originally the Leffler was used to transport gasoline and refined petroleum products. It had 14 tanks and a capacity of approximately 70,000 gallons. On October 1, 1935 Daniel W. Robin purchased the tanker for $5,000, giving a deposit of $500. On October 10, 1935 Robin, accompanied by Watson, made a deposit of $7,000 in cash in his bank account. The money was mostly in denominations of five and ten dollar bills, indiscriminately arranged. Among them was a $100 counterfeit bill. Robin told the cashier he received the money from a New York bank. In his direct testimony he stated that he brought the money from a box at his home. On the same day Robin withdrew $4,500 and $1,500 by check. The $4,500 check was drawn to the order of the Standard Shipping Company, in final payment for the vessel.

On October 8, 1935 the Chesapeake Marine Railway Company began extensive repairs on the vessel, including the installation of an additional tank of 7,000 gallons. Robin paid for the work with three checks, the third dated January 14, 1936. Robin and Watson (who used the name Thomas) made all the arrangements with the Chesapeake Marine Railway Company. The work on the vessel was completed November 14, 1935, at which time it left dry dock. James T. Brown, calling himself Andrews, actively supervised the work during the last few weeks, and Captain Charles Larkey was also present. On November 8, 1935 Charles Larkey took an oath as master of the vessel. On November 9, 1935 Robin signed a bill of sale for the Charles D. Leffler to the Economy Oil Transportation Corporation. That company had been incorporated on November 1, 1935 with Gerald R. Wade as president. Wade signed all necessary papers to complete the enrollment of the vessel.

Some time in November, 1935 the vessel Anna D. Anagagana left Yarmouth, Nova Scotia, proceeded to St. Pierre Miquelon, contacted a tramp steamer, took on about 2,000 cases of alcohol, proceeded to United States waters and at or near Hog Island Light met the Leffler and discharged its entire cargo. Because of high seas the two vessels smashed into each other. The port side of the Leffler was damaged. During this trip James T. Brown, who was on the Leffler, came aboard the Anna D., as pilot. In December 1935 the Leffler went into drydock at South Rondout, New York, for repairs to her port side. The work took a few days and the vessel left on December 8, 1935. Additional repairs were made at or about December 21, 1935 and April 21, 1936. On the latter date seven new tanks were installed. The work was billed to the Economy Oil Transportation Corporation. Some time between November, 1935 and the spring of 1936 the Leffler was icebound at Tarrytown. On its way to Tarrytown it stopped at 125th Street, New York City, and at that point Robin came on board to inquire of its engineer about parts for the vessel's pump. This was after its sale to the Economy Oil Transportation Corporation and after the vessel had been used to take the cargo of alcohol off the Anna D.

When the Leffler was seized and Captain Charles Larkey was arrested he stated that he had procured his cargo of alcohol from the steamship Hillfern about 100 miles off the United States coast. The evidence discloses that the Hillfern took on a cargo of 180,000 gallons of alcohol at Antwerp, Belgium. At the time of the loading Henry Gerke was on the quay in conversation with the agents for the distillery. The Hillfern left port March 30, 1936, ostensibly for Uruguay. Gerke returned from Europe April 8, 1936. A dock at Bayway, New Jersey, had been leased to a fictitious Morris Slavin trading as Criterion Oil Company on April 14, 1936. In fact Wade signed the lease using the name Morris Slavin. On April 21, 1936 the Leffler left dry dock and between that date and April 25th contacted the Hillfern at sea. On April 25th the Leffler was in the process of unloading alcohol upon the leased dock at Bayway, New Jersey. Charles Larkey and James Holland were arrested on the dock as they were returning to the vessel past midnight. Larkey admitted he was captain of the Leffler. The vessel's log contained entries in Larkey's handwriting from December 8, 1935 to April 25, 1936. At the time of the seizure person-

al papers belonging to Brown were found in the captain's quarters of the Leffler. Holland gave his name as Wentzel, and said he was the engineer. He took the job some time between December, 1935 and the spring of 1936. At the time of the seizure of the Leffler Joseph Turansky approached the customs men in the dark and called to them "Who are you fellows, coast guardsmen?" and when asked who he was said "I am the watchman, come on, let's go up to the office so we can straighten this matter out." The agent said "No, I am placing you under arrest, you are to come over to our patrol boat." Turansky attempted to escape but was placed under arrest. Turansky was not employed as a watchman by the New York Oil Storage and Transportation Company, the owner of the dock at Bayway, New Jersey.

This in brief is the evidence as to the purchase, use and seizure of the Charles D. Leffler. The government presented additional evidence as to Gerke and Brown. In January, 1935 the vessel Reo 1 left the port of Yarmouth, Nova Scotia, with Captain Stanley Collins in command. It stopped at St. Pierre Miquelon where it took on a cargo of about 2,000 cases of alcohol, proceeded to United States waters, made contact with small boats off Barnegat Light, discharged its cargo on to small boats, went out to sea where it met the steamship Accuracy, took on a cargo of alcohol, and discharged that cargo on to the small boats. Brown was on one of the boats. The Reo 1 again met the Accuracy, proceeded up the Raritan River, took on Brown as pilot and discharged its cargo at night at an old brick yard on the Raritan River. When the Reo 1 was about to leave Yarmouth Gerke was on the dock talking to Captain Collins. When the Reo 1 reached the brickyard a witness saw a man whom he identified as Gerke come on board. The identification was somewhat shaken on cross-examination, but in view of the character of the cross-examination we think that the jury may well have credited the witness's statement. In May, 1935 the vessel Augusta and Raymond with Captain Stanley Collins as master, sailed from Halifax, Nova Scotia. Before the boat left port Gerke came on board. The Augusta and Raymond proceeded to St. Pierre Miquelon where it contacted a tramp steamer off Gallantry Head, took on a cargo of approximately 4,000 cases of alcohol and discharged the cargo on yachts near New York. Brown was on one of the yachts. Gerke was seen in Yarmouth, Nova Scotia, in November, 1935, which was about the time when the Anna D., with Captain Collins as master, sailed from Yarmouth and met the Leffler.

*Henry Gerke:* It is difficult to conceive that merely a succession of coincidences was responsible for Gerke's presence in Halifax and Yarmouth (Nova Scotia), in New Jersey and in Antwerp, Belgium, just as cargoes of alcohol were being either loaded or unloaded upon the Reo 1, the Augusta and Raymond and the Hillfern. The only credible explanation of his peripatetic activities is that he was directly concerned in the purchase of the alcohol and in its transportation to and importation into the United States.

*James T. Brown:* This defendant served as pilot upon the Reo 1 at the very time it was discharging its cargo of alcohol secretly at the old brick yard, and was upon one of the small boats upon which the Augusta and Raymond discharged its cargo. He actively participated in plans for reconditioning the Leffler for rumrunning purposes and some of his possessions were upon that vessel at the very time of its seizure. His participation in the voyages of the first two vessels has all the earmarks of guilt.

*Charles Larkey:* No more need be said than that Captain Larkey was master of the Leffler at the very time alcohol of foreign production upon which no duty had been paid was being transferred from the vessel to the dock.

*James Holland:* Holland served as engineer upon the Leffler some time after it had been used to transport alcohol obtained from the Anna D. and had not completely severed his association with that vessel on April 25, 1936, which was after it had been used to transport alcohol obtained from the Hillfern.

*Joseph Turansky:* According to his own statement Turansky was a watchman and the circumstances were such that the jury was entitled to believe that he was watchman for the conspirators at the very time when the alcohol procured from the Hillfern was being transferred from the Leffler to the dock.

*Gerald R. Wade:* Wade actively participated in the formation of the corporation which took title to the Leffler and in the registration of that vessel before it began its career as an alcohol runner. Thereafter he participated in procuring dock facilities for the Leffler and it was at the dock which he procured that the vessel was seized.

We conclude that all of the aforementioned defendants were directly connected by the evidence with the illegal importation of alcohol into the United States and with a scheme to import alcohol without the payment of duty thereon. Their conviction must, therefore, be affirmed.

 *Robin and Watson:* The testimony as to these two defendants is of an entirely different nature. It would justify a finding that Robin and Watson purchased the vessel having in mind its sale to others or even that at the time they made the purchase they had received part payment of the agreed purchase price from the ultimate purchasers. It might conceivably justify an inference that they knew of the business to which the purchasers intended to put it. But the finding that these defendants for profit sold a vessel to persons who they knew intended to and later did use it in an illegal enterprise will not support their conviction for the offense with which they are charged in the third count of the indictment. For there is no evidence that they participated in the conspiracy or knew of its existence. In United States v. Falcone, 311 U.S. 205, 61 S. Ct. 204, 85 L.Ed. 128, the Supreme Court held·that evidence of the furnishing of supplies to an illicit distiller with knowledge that they were to be used illicitly was not sufficient to convict the one who furnished the supplies of membership in a conspiracy to which the distiller was a party, but of which the supplier was not shown to have any knowledge. In the present case it is urged that from the testimony as to Robin's visit to the Leffler during its stop at 125th Street, New York City, the inference of knowledge on his part of the conspiracy may be drawn. We think, however, that this evidence is equally susceptible to an inference consistent with his innocence, namely that he visited the vessel in the desire to safeguard his lien upon her for the substantial amount of purchase money still remaining unpaid. We accordingly think the rule of the Falcone case is applicable to the government's case against Robin and Watson, and that the trial judge should have directed a verdict of not guilty as to them.

In No. 7770 the judgments as to Henry Gerke, James T. Brown, Gerald R. Wade, Charles Larkey, James Holland and Joseph Turansky are affirmed. In No. 7783 the judgments as to Daniel W. Robin and F. W. Watson are reversed and new trials are ordered.